**Application for the extradition of Vito D'AMICO.**

United States District Court
S. D. New York.
July 21, 1960.

Harper & Matthews, New York City, for relator; Harold Harper and Samuel Newfield, New York City, of counsel.

Fink & Pavia, New York City, for Consul General of Italy at New York; David A. Botwinik, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

In extradition proceedings brought by the Republic of Italy the relator has been found by a United States Commissioner to be extraditable to Italy under the Convention of 1868 between Italy and the United States (15 Stat. 629) as amended by the Supplementary Convention of 1884 (24 Stat. 1001).

Upon petition for writ of habeas corpus I upheld the determination of the Commissioner, discharged the writ which had been issued, and remanded relator to the custody of the United States Marshal to await the warrant of the Secretary of State authorizing his surrender to the Republic of Italy or such other order as the Secretary might issue. D.C., 177 F. Supp. 648. The background of the case is discussed in that opinion.

Subsequent to that decision relator, represented by new counsel, moved to reopen the habeas corpus proceedings, for a rehearing and for the opportunity to present evidence not previously offered before the court or the Commissioner bearing on his extraditability.

This application now before me for decision is based on grounds which were not raised on the original application for writ of habeas corpus, or, indeed, on the hearing before the Commissioner. The only question of fact raised before the Commissioner concerned the identity of the relator as the fugitive sought by the Italian Government. As I stated in my previous opinion (177 F.Supp. at page 651):

"Relator does not deny that the crimes for which extradition is sought were committed or that there is no probable cause to believe that a Vito D'Amico is guilty of them.

He claims that he is not *the* Vito D'Amico sought."

The evidence on this score before the Commissioner was conclusive against D'Amico and I so found.

The main focus of relator's defense before the Commissioner and of his attack on the Commissioner's findings concerned the effects of the second world war upon the treaties under which D'Amico's extradition is sought. He also raised questions as to the admissibility of certain evidence of identification, claiming that it had been obtained by unlawful search and seizure. These questions were also resolved against the relator on his original application. Subsequently the Court of Appeals for this circuit, in another case, reached the same conclusion as to the effects of the second world war upon these extradition treaties. See Gallina v. Fraser, 2 Cir., 278 F.2d 77, affirming D.C., 177 F.Supp. 856.

No questions as to the sufficiency of the evidence before the Commissioner to establish probable cause to believe that D'Amico had committed the crimes charged (as distinguished from his identity with the fugitive sought) were raised upon his original application. I did not pass on that question and my decision was based upon the assumption that probable cause had been sufficiently established by the evidence. Now for the first time relator's new counsel has raised substantial questions as to the sufficiency of the evidence on this key point on which the right to extradition must rest.

The relator, an American citizen since 1950, has not been in Italy since 1948, when he emigrated to the United States. He was married to an American citizen who preceded him here with others of his family. The crimes of "aggravated robbery" and kidnapping for the purpose of extortion with which he is charged are alleged to have been committed in 1946, some two years before he left Italy. It appears that no charges had been laid against him before his departure, nor was he informed of any impending charges. His conduct in the United States has not been impugned.

In January 1951 five alleged participants in the crime who had been arrested in Italy were tried before the Court of Assizes of Traponi, Sicily. Relator was tried with them in absentia and was not in any way represented at the trial. All of the defendants were convicted and the relator was sentenced to imprisonment for fourteen years, two months and twenty days, and fined 57,770 lire. The extradition proceedings followed.[1]

■ The consequences to the relator of extradition to Italy would be extremely serious. No technical objections will be permitted to stand in the way of the reopening and rehearing of his petition for writ of habeas corpus on grounds not heretofore raised and passed on. See Salinger v. Loisel, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989; United States ex rel. Argento v. Jacobs, D.C.N.D.Ohio, 176 F. Supp. 877, 878. Relator's application to reopen his petition for writ of habeas corpus and for a rehearing thereon is granted in the exercise of my discretion.

■ Habeas corpus in extradition proceedings is limited in scope. It does not afford a rehearing of what the Commissioner has already decided. The alleged fugitive has had his hearing before the Commissioner and "habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonble ground to believe the accused guilty." Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct.

541, 542, 69 L.Ed. 970. See, also, Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234; Re Luis Oteiza y Cortes, 136 U.S. 330, 10 S.Ct. 1031, 34 L.Ed. 464; Bryant v. United States, 167 U.S. 104, 105, 17 S.Ct. 744, 42 L.Ed. 94; Elias v. Ramirez, 215 U.S. 398, 406, 30 S.Ct. 131, 54 L.Ed. 253.

I have already held that the Commissioner had jurisdiction and that the offense charged is within the treaty. There remains the newly raised question as to whether there was any evidence warranting a finding that there was reasonable ground to believe the accused guilty of the crimes charged.

■ The function of the Commissioner is not to determine whether the alleged fugitive is in fact guilty of the crime of which he is accused. Under 18 U.S.C. § 3184, the hearing before the Commissioner is held "to the end that the evidence of criminality may be heard and considered" and so that he may determine whether "he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty."[2] This language refers to the standard of proof required before the Commissioner as defined in the applicable extradition treaty. Factor v. Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315.

■ Article I of the treaty with Italy under which these extradition proceedings lie (15 Stat. 629, 24 Stat. 1001) provides that delivery up to the demanding government of persons convicted or charged with the crimes covered by the treaty.

1. The Italian government represents that if D'Amico is extradited it will not rest on the conviction in absentia but will try him again. However, that is not a concern of this court. The conditions under which a fugitive is to be surrendered to a foreign country are to be determined by the non-judicial branches of the Government. Gallina v. Fraser, supra.

2. 18 U.S.C. § 3184 provides: "Whenever there is a treaty * * * for extradition * * * any commissioner * * * may upon complaint made under oath, charging any person found within his jurisdiction, with having committed * * * any of the crimes provided for by such treaty * * *, issue his warrant for the apprehension of the person so charged, that he may be brought before such * * * commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty * * * he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State * * *."

"* * * shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension or commitment for trial, if the crime had been there committed." [3]

As stated in Benson v. McMahon, supra, the test as to whether such evidence of criminality has been presented is the same as that

"of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him." 127 U.S. at pages 462–463, 8 S.Ct. at page 1243.

It is in essence the same as the test of whether "there is probable cause to believe that an offense has been committed and that the defendant has committed it" under Rule 5 of the Federal Rules of Criminal Procedure, 18 U.S.C.A.

■ The evidence before the Commissioner connecting D'Amico with the crimes of kidnapping and robbery with which he is charged, is wholly documentary. It consists of extracts from various statements made to the police and to examining magistrates by D'Amico's alleged accomplices and by the alleged victim of the crimes charged, a statement by a person who apparently was a police official and the opinion and judgment of the court which tried the other alleged participants in person and D'Amico in absentia.[4]

In substance the charges against D'Amico are that on April 15, 1946 in Palermo, Sicily, six persons, including D'Amico, forcibly abducted one Vincenzo Meo and kept him prisoner for several days, that they forced him to write a note demanding ransom of four million lire and that at the time the victim was seized the kidnappers took from his home a substantial quantity of personal property and a smaller amount of money. The victim was released, however, without payment of ransom, apparently because the identity of some of the criminals had become known to his relatives.

The proof connecting D'Amico with these events is very tenuous indeed.

Though the kidnapping is alleged to have occurred on April 15, 1946, Meo, the alleged victim, made no complaint to the authorities. It was not until almost two years later, in March 1948, that the Sicilian police, while investigating another kidnapping, got wind of the Meo kidnapping when they arrested two brothers, Luigi and Andrea LoBue in connection with the other case. By that time relator had already emigrated to the United States.

On March 11, 1948, after his arrest, Luigi LoBue gave a statement to the police involving his cousins Guiseppe and Antonino, one Antonino Giambone and the relator D'Amico in the Meo kidnapping. He stated that D'Amico originated the plot and had induced him to participate. According to this statement the conspirators took Meo from his home by armed force and also took personal prop-

3. The treaty provision is common to many of the treaties of extradition to which the United States is a party. Treaties containing this provision actually antedate the predecessor of Section 3184, 9 Stat. 302 (1848). Thus, before the enactment of the predecessor to Section 3184 the treaties containing this provision were self-executing. See Factor v. Laubenheimer, supra. In fact many of the early cases relied directly upon the treaties without citing the statute. See, e.g., In re Kelley, D.C.D.Minn.1885, 25 F. 268; In re Henrich, C.C.S.D.N.Y. 1867, Fed.Cas.No.6,369.

4. The documents were properly admitted under 18 U.S.C. § 3190 which makes evidence admissible in such a proceeding if the appropriate American consular official in the demanding country certifies that such evidence would be admissible in the demanding country in a similar proceeding there.

erty and money. A sack was placed over Meo's head, he was compelled to mount his own horse and, after stopping in a cave, to ride to a one room shack on property owned by D'Amico at Platti some distance away.

Meo was detained there until April 20, 1946 and was compelled to write a letter to his brother giving instructions as to the payment of ransom of four million lire. According to the first Luigi LoBue statement, on Good Friday, April 19, 1946, Luigi met his brother Andrea who informed him that two strangers were looking for him and had asked Andrea to let Luigi know that he was to release the kidnapped man immediately. Luigi then confided to his brother Andrea, who knew nothing of the kidnapping, what had occurred. Thereupon Luigi, with his cousins Guiseppe LoBue and Antonino LoBue, again put Meo on his horse with his head covered with a sack, released him en route to his home, and dispersed.

Andrea LoBue also made a statement to the police on the same day denying participation himself, but corroborating Luigi's story concerning what Luigi had related to him concerning these events. At the same time Meo, the victim, made a statement to the police in which he described his capture, confinement and release, but was unable satisfactorily to identify any of his abductors. He made no mention of the relator D'Amico either on that occasion or in any subsequent statements. Luigi then led the police to the shack on relator's farm at Platti and there Meo identified an aluminum canteen in the shack as one he had drunk from during his confinement.

In June 1948 pre-trial examinations were held before an examining judge. On that occasion Luigi LoBue recanted his previous statement and denied any participation in the kidnapping. He said that D'Amico had told him that he had planned to kidnap Meo but that he had tried to dissuade D'Amico from the kidnapping because of "a certain friendship between Meo and me." He then repeated the story about the visit of the two strangers who insisted upon Meo's release and said that he had informed D'Amico of what they had told him, and that D'Amico then arranged for the release. He denied that his previous statement to the police was true and claimed that the police had "used ill treatment against me."

While the testimony at the trial does not appear in the record, it appears from the judgment of the court that at the trial Luigi LoBue made a complete retraction of his confession to the police and not only denied that he had anything to do with the kidnapping but also that he had had any contacts whatsoever with D'Amico. His brother Andrea also made a complete retraction and denied the story of the two strangers and that his brother had spoken to him about D'Amico, or had told him anything concerning the kidnapping.

The court found all six of the defendants, including the relator, guilty. As concerns D'Amico the court held the charges true "inasmuch as they tally * * * with the fact that the kidnapped man was kept in a farmhouse of the said D'Amico." Thus the evidence against D'Amico consists solely of the confession of an alleged accomplice which was twice retracted, that of another, also retracted, as to what had been told him by the first, and the fact that the alleged victim was held for a few days in a shack on property owned by D'Amico.

The relator now offers to prove that the shack in which Meo was allegedly held, while on property which he owned, was a single room shack containing a haymow, seven or eight miles from his residence, in an isolated area, and rarely visited by himself or anyone else.[5] Such evidence, he urges, will tend to show that the mere fact that Meo may have been

---

5. D'Amico claims that on the previous hearing his then counsel did not advise him that he had a right to present evidence, that he spoke practically no English and did not understand what was going on.

held on property which he owned is of no probative significance. There are strong indications already in the documentary record from Italy to sustain relator's contention on this point.

■ Such evidence, offered to explain a fact relied upon by the demanding Government, is admissible in an extradition hearing. Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274.

■ If it were established that the use of the isolated shack to detain the victim in itself gave rise to no reasonable inference that D'Amico knew of the kidnapping, the evidence connecting D'Amico with the crime charged would consist solely of the completely recanted confessions of alleged accomplices in the crime. The testimony of an accomplice is to be viewed with healthy scepticism. Phelps v. United States, 5 Cir., 252 F.2d 49; Rosen v. United States, 2 Cir., 271 F. 651, 656; Holmgren v. United States, 217 U.S. 509, 30 S.Ct. 588, 54 L.Ed. 861. Where, as here, such testimony has been completely recanted, its probative value is thin indeed.

Moreover, it must be viewed in the light of the fact that when the confession was made D'Amico had already departed for the United States and his alleged accomplices when arrested had every reason for seeking to place the principal blame on one who was 3,000 miles away and unable to defend himself.

In addition, it may be noted that the documents introduced by the demanding government are *extracts only* from the statements made and are apparently only part of the prosecutor's file. The translations are almost incoherent in places. Finally, to add to the mystification there is a statement from a Dr. Guiseppe Nicolicchia, apparently one of the investigating police officials, indicating that the sole evidence against D'Amico is his ownership of the shack in which the victim was held.

Thus, it is plain that the evidence presented against D'Amico was unsatisfactory to say the least. There is at the least grave doubt on the present record as to whether there was any evidence warranting a finding that there were reasonable grounds to believe D'Amico guilty of the crime charged.[6]

---

6. There is considerable doubt whether an indictment in New York based on such accomplices' testimony would withstand a motion to dismiss, see People v. Sweeney, 213 N.Y. 37, 106 N.E. 913, although such testimony might furnish sufficient ground for a magistrate to hold an accused for action by the Grand Jury. See, e.g., People ex rel. Odell v. Hall, 204 Misc. 713, 124 N.Y.S.2d 289.

However, the federal courts in extradition proceedings have consistently refused to follow state rules on preliminary hearings which increased the burden upon the demanding government beyond that which generally obtains on preliminary examinations. Collins v. Loisel, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956; Glucksman v. Henkel, 221 U.S. 508, 31 S. Ct. 704, 55 L.Ed. 830; Ex parte Glaser, 2 Cir., 176 F. 702; Curreri v. Vice, 9 Cir., 77 F.2d 130 (concurring opinion); See Rice v. Ames, 180 U.S. 371, 372, 21 S.Ct. 406, 45 L.Ed. 577. Despite the oft repeated dictum of Factor v. Laubenheimer, supra, to the effect that probable cause in extradition cases should be determined by state standards as to quantum of proof on preliminary hearings, (see, e.g., In re Farez, C.C.S.D.N. Y., Fed.Cas.No.4,645; In re Kelley, D.C. D.Minn., 25 F. 268; Glucksman v. Henkel, 221 U.S. 508, 513, 514, 31 S.Ct. 704, 55 L.Ed. 830; Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274; Curreri v. Vice, supra; Cleugh v. Strakosch, 9 Cir., 109 F.2d 330), it seems clear that this practice originated with Rev.Stat. § 1014 (1875) and its predecessors providing that preliminary examinations should follow state law and when there was no uniform federal procedure on such examinations. See In re Ezeta, D.C., 62 F. 972. It may well be that the uniform federal practice on preliminary examinations before the Commissioner brought about by Rule 5 of the Federal Rules of Criminal Procedure and the amendment to former Section 1014 (see 18 U.S.C. § 3041) eliminating conformity to state practice should now apply in extradition cases despite their exclusion from the general application of the Federal Rules of Criminal Procedure by Rule 54(b) (5). This is the result reached by cases like Collins v. Loisel, supra, and Ex parte Glaser, supra, see, also, Rice v. Ames, supra,

In this state of the record it becomes of significance that there is real doubt as to whether the Commissioner actually made a finding that there was probable cause to believe that D'Amico committed these crimes. A careful reading of his findings indicates that he passed directly only upon the two questions raised by the relator at the hearing—whether the crime charged was extraditable under the treaty and whether relator was in fact *the* Vito D'Amico "mentioned in the judgment filed in Italy." The Commissioner found against the relator on both of these points but his findings go on to say *"accordingly* there is probable cause to believe that the offense charged was committed by the respondent". (Emphasis added.)

 This does not seem to me, in the light of the circumstances here, to be an independent finding that there was probable cause to believe that the offense was committed by the relator. The explanation of the omission of any independent finding on this point may well be that the sole question of fact raised by relator's previous counsel on the hearing was the question of identity. Nevertheless, the Commissioner was required under the statute and the treaty to make a specific finding as to the sufficiency of the evidence to establish probable cause that relator had committed the offenses. See Benson v. McMahon, supra, 127 U.S. at page 463, 8 S.Ct. at page 1243, 32 L.Ed. 234; Bryant v. United States, supra; Fernandez v. Phillips, supra.

In the light of this record and the circumstances of this case such an ambiguity in the findings cannot be viewed as merely a harmless technicality. The relator is entitled to evaluation of the evidence on the issue of whether it establishes that there is probable cause to believe that relator committed the offenses charged and to an independent finding on that issue.

which, while indicating that state law should apply, reject peculiar local variations of practice with respect to preliminary examinations which would unduly

The case will therefore be remanded to the Commissioner for further proceedings not inconsistent with this opinion. Upon such proceedings the hearing before the Commissioner will be deemed reopened and the relator will be permitted to present such evidence on his own behalf as may be proper in extradition proceedings. See Charlton v. Kelly, supra; In re Oteiza, supra; United States ex rel. Argento v. Jacobs, supra; In re Farez, C.C.S.D.N.Y., Fed. Cas. No. 4,645; In re Wadge, D.C., 15 F. 864. The demanding government will likewise be permitted to present additional evidence if it has any.

In the meantime the petitioner will not be discharged from custody. In re Farez, C.C.S.D.N.Y., Fed.Cas. No. 4,645, approved In re Farez, C.C.S.D. N.Y., Fed.Cas. No. 4,646. Cf. Ex parte Fudera, C.C.S.D.N.Y., 162 F. 591. Bail in the amount presently in force will be continued.

Settle order on notice.

hamper the demanding government in extradition proceedings. Cf. Factor v. Laubenheimer, supra.